IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

JAMES HENRY RINCKER,

        Plaintiff,

    v.

OREGON DEPARTMENT OF CORRECTIONS;
MAX WILLIAMS; STAN CZERNIAK;
BRIAN BELLEQUE; B. KELLY; OFFICER
LONNY WEBB; and CRAIG MITCHELL;

        Defendants.

Civil No. 04-6410-AS

OPINION AND ORDER

        JAMES HENRY RINCKER
        SID #11649752
        Snake River Correctional Institution
        777 Stanton Blvd.
        Ontario, OR  97914

             Plaintiff *Pro Se*

        HARDY MYERS
        Attorney General
        LEONARD WILLIAMSON
        Assistant Attorney General
        Department of Justice
        1162 Court Street NE
        Salem, OR  97301

             Attorneys for Defendants

1 - OPINION AND ORDER -

ASHMANSKAS, Magistrate Judge.

Plaintiff, an inmate at the Snake River Correctional Institution, brings this civil rights action pursuant to 42 U.S.C. § 1983 *pro se*. The parties have consented to allow a Magistrate Judge to enter final orders and judgment in this case in accordance with 28 U.S.C. § 636(c).

Currently before the court are Defendants' Motion for Summary Judgment (#43), Plaintiff's Cross-Motion for Summary Judgment (#70), and Defendants' Motion to Strike Plaintiff's Cross-Motion for Summary Judgment (#78).[1]  For the reasons that follow, Plaintiff's Cross-Motion for Summary Judgment and Defendants' Motion to Strike Plaintiff's Cross-Motion for Summary Judgment are DENIED, and Defendants' Motion for Summary Judgment is GRANTED.

## BACKGROUND

Plaintiff alleges Defendants violated his due process rights by classifying him to the Intensive Management Unit ("IMU") at the Oregon State Penitentiary ("OSP") from February 22, 2002, through March 29, 2006.  Plaintiff also alleges the conditions of confinement he experienced while housed in the IMU violated his Eight Amendment right to be free from cruel and unusual punishment.

---

[1]Plaintiff was advised of federal summary judgment standards in a Summary Judgment Advice Notice (#23) issued by the Clerk of the Court on July 28, 2005.

Defendants argue Plaintiff is not entitled to relief because: (1) Plaintiff alleges claims against Defendants who were not personally involved in any of the alleged violations; and (2) Defendants are entitled to qualified immunity from liability in damages.

On December 29, 2005, Defendants filed their Motion for Summary Judgment.  After requesting and receiving numerous extensions of time to file a response to the motion, on July 19, 2006, Plaintiff filed a Cross-Motion for Summary Judgment.  On September 27, 2006, Defendants filed a Motion to Strike Plaintiff's Cross-Motion for Summary Judgment, arguing Plaintiff filed his motion well after the due date for filing dispositive pretrial motions.

## SUMMARY OF FACTS

### I.    ODOC Custody Classification Procedures

The process for custody classification of prisoners in the custody of the Oregon Department of Corrections ("ODOC") is set forth in Oregon Administrative Rules, Chapter 291, Division 104. ODOC uses the custody classification system to determine the level of supervision each inmate requires.

"Maximum" custody is the highest of the inmate supervision levels.  An inmate classified as "maximum" is one who presents an extreme risk of escape, violence, and/or disruption to the safe,

secure, and orderly operation of ODOC. Maximum custody inmates are housed in one of several special housing units, including the IMU at OSP.

The IMU is designed and staffed to provide the greatest level of custodial care and supervision for ODOC's highest risk inmates. Assignment to the IMU is not automatic, but instead can occur only after a series of reviews. On February 1, 2005, a Special Population Management Committee ("SPMC"), consisting of the Chief of Security, a Mental Health Manager, and the Administrator of Population Management, was created to perform these reviews. Prior to the creation of the SPMC, Program Managers in ODOC's Classification and Transfer Section conducted these reviews.

Inmates are not entitled to a hearing at the time of their classification review and assignment to the IMU. However, when an inmate is scored "maximum" custody and assigned to the IMU as a result thereof, he is notified and provided with copies of the relevant document, as well as a description of his options for administrative review and an administrative review request form. Inmates are also provided written criteria for level promotion and demotion while housed in the IMU.

Once an inmate is assigned to the IMU, there are four program levels to move through. All inmates enter the IMU at program Level 2. The inmate's adjustment and behavior while housed in the IMU determines his program level. With clear behavior, an inmate

can progress to Level 3 within approximately two months, and to Level 4 with an additional three months. A major misconduct or repeated incidence of misconduct may result in a reduction of program level.

A non-IMU assignment comes about when an inmate custody classification level is changed from "maximum" to "close" or lower. This may occur when the inmate maintains clear conduct in the IMU and a classification review lowers his custody level or by means of a classification override recommendation.

## II. **Plaintiff's Placement in the IMU**

Plaintiff was assigned to the IMU at OSP on February 22, 2002, and remained there until March 29, 2006, when he was transferred to the Snake River Correctional Institution to be housed in the Administrative Segregation Unit ("ASU"). Plaintiff's assignment to the IMU came about after he committed a major misconduct, which resulted in his custody classification score of "maximum." Prior to the major misconduct, Plaintiff's classification score was "medium" custody.

During Plaintiff's stay in the IMU, he was subject to numerous classification reviews. Defendants maintain Plaintiff was sent copies of his custody classification summaries on each occasion, and that he did not request administrative review. Plaintiff states he "never received a notice or form[al] hearing *before* IMU transfer."

5 - OPINION AND ORDER -

### III. <u>Conditions of Confinement in the IMU</u>

The IMU at OSP is divided into four two-story housing sections (A, B, C, and D). Each of the four sections contains 49 single-person cells divided into two tiers, 25 cells on the top tier and 24 cells on the lower tier. Each cell measures 11' 10" long by 6' 10" wide by 8' high. The design of the IMU permits natural light to enter the unit through the exercise yards.

IMU cells do not contain mirrors for security reasons. Inmates have access to a mirror in the IMU recreation yard where they are allowed to shave using an electric razors. The toilets in the IMU cells are stainless steel. Porcelain toilets are not used because they can be broken, and the sharp pieces used as a weapon. Porcelain toilets are currently located in other special housing units and general population cells built before the IMU, but all new prison construction, regardless of security level, now contains stainless steel sinks and toilets.

IMU cells do not contain book shelves. Most cells do, however, have a writing table. Some cells on Unit A do not have writing tables, because they were torn from the wall by prior inmates and have not been replaced. Unit A is used as the intake unit, and to house IMU inmates who are refusing to participate in programming. From February 22, 2002, to June 29, 2004, Plaintiff was assigned to a variety of cells on Unit A at different times and for short periods of time based on his behavior.

6 – OPINION AND ORDER –

The temperature in the IMU is regulated by a computer located in the OSP Physical Plant.   The temperature is generally maintained between 71 and 72 degrees.   Temperature changes can occur, however, due to outside conditions, opening the recreation door on the housing unit which lets in outside air, or heating equipment.

IMU inmates are issued two coveralls or scrubs, footwear, two pairs of socks, gym shorts, and a choice of regular or thermal underwear to wear in their cells.   Inmates are also issued two blankets.

The lights always remain on in the IMU cells.   During the day, a 32-watt fluorescent light controlled by the IMU staff is on, and inmates control a second, 32-watt fluorescent light over the desk area.   At night, IMU cell lights are dimmed to 5 watts. The 5-watt bulb remains on so staff can see into the cell and observe the inmate to ensure safety.

All OSP inmates, including those in general population, may be observed by prison staff twenty-four hours a day, seven days a week.   In the IMU, each of the four units has a control center from which staff can observe an inmate in his cell.   For security reasons, staff must be able to observe an inmate in his cell to guarantee he is safe and not harming himself, or engaging in unauthorized conduct.

IMU inmates are permitted to leave their cells as appropriate to their program level for visits, exercise, showers, medical or dental services, hearings, psychological services, interviews, or for other reasons as authorized by the officer in charge. All inmates in the IMU are restrained and escorted by two staff members whenever they leave their cells. This security measure is in place to ensure the safety of the escort staff and the inmate.

Before an IMU inmate is escorted from his cell, the inmate is placed in wrist restraints with a cloth tether. The officer instructs the inmate to back up to the cell door and the officer applies the writ restraints to the inmate's wrists through a cuff port in the cell door. Once the restraints are applied, the cell door is opened and the escort officer holds the tether while the inmate is escorted to his destination. Using a tether during escort increases staff's ability to control the inmate should he engage in aggressive behavior or move suddenly away from the escort staff. If the inmate does become aggressive or turns away, escort staff are trained to pull up on the tether which gives more control over the inmate and applies pressure to the wrist restraints.

An exception to having two staff members escort an inmate in IMU is made when an inmate orderly is released on the tier to perform housekeeping duties. The same is true for inmates who are at Program Level 4 and who have demonstrated clear conduct. These

inmates may be released from their cell without restraints but only to walk to and from the shower located on the same unit and only when they are the only inmate on the tier.

All cells in the IMU are searched on a regular basis and at least weekly by rule. The searches are unscheduled, and are necessary to ensure cell sanitation and locate contraband. Inmates in the IMU are frisk-searched anytime they enter or leave their cell within the IMU. A "frisk" means "to search a person for something by running the hands over the clothed person, through the hair, inspecting pockets and cuffs, and other items in his/her possession." Inmates are skin-searched each time they enter and leave the IMU building. A skin search is "a search procedure wherein the person being searched removes all of his/her clothing and is visually examined and clothing removed is carefully inspected before return and redressing, for the purpose of detecting contraband." Skin searches are performed in an area out of the view of other inmates in order to avoid unnecessary embarrassment or indignity to the inmate.

Internal searches are a digital intrusion of body orifices. Internal searches are not performed in the IMU, and may only be performed by competent medical personnel upon authorization of the functional unit manager, officer of the day, or officer in charge of the facility, and only when there is reasonable suspicion.

Each IMU inmate is permitted the opportunity to exercise out of his cell for 40 minutes (which may include showering and shaving), three days a week (Monday, Wednesday, and Friday).  On Saturday and Sunday, an inmate may exercise and shower, but cannot shower only.  IMU inmates exercise in the IMU exercise yard.  Each IMU unit has its own indoor and outdoor exercise area.  The indoor portion of the yard measures 11' 10" by 16'.  The outside portion extends 10' 8" by 41', allowing exposure to the elements.

IMU maintains a satellite law library containing basic legal volumes necessary to conduct legal research, and gives IMU inmates access to reported state and federal cases relevant to filing a legal action concerning an Oregon inmate's criminal conviction and sentence, parole, or conditions of confinement.  IMU inmates have access to the satellite library materials by sending a written request to the IMU legal officer.  The inmate will be scheduled for one hour on Wednesday, Thursday, or Friday, and will be escorted to the IMU satellite library where the inmate can perform his legal research and other legal work.  In some cases, an inmate may check out a legal reference book over a weekend.

IMU inmates have access to additional law library materials through a correspondence system.  They can request a legal library order form from the IMU legal officer, who forwards the completed request to the OSP main law library the same day.  The requested

materials are delivered to the IMU by the end of the following business day, and delivered to the inmate the next business day.

Every Monday, time is set aside for IMU inmates to have telephone access to inmate legal assistants assigned to the OSP main law library.  IMU inmates can request an attorney telephone call if they demonstrate they have a court deadline within ten business days.

IMU inmates are not otherwise permitted access to a telephone except for verified emergencies, such as death, serious illness, or injury of an immediate family member.  Personal telephone calls are not allowed for security reasons.

IMU inmates at Program Level 2 are allowed two one-hour visiting sessions per month.  As the inmate progresses to higher program levels, additional visiting time is authorized.  Visitors to IMU inmates must be immediate family members, and are scheduled in advance.

IMU inmates may receive religious guidance if requested. Religious practice is restricted to IMU inmates' cells.  Religious service staff and chaplains visit the IMU at least once a week, and additional religious services are provided on an as-requested basis several times per week by clerical and lay volunteers. Bibles and other religious holy books are available, through the property officer and the chaplains, and are provided to IMU inmates based upon program level.

11 - OPINION AND ORDER -

IMU inmates are authorized to have books, magazines, and newspapers as authorized by their program levels. IMU inmates are not allowed access to the OSP general library, because they must be segregated from general population inmates for security reasons. Instead, general reading materials are provided to inmates in the IMU. Once a week, paperback books are brought on a cart into the unit and the inmate can select a book from the cart and exchange it for one he may have in his cell. For security reasons, inmates in the IMU cannot possess hardbound books and they cannot exchange books and magazines with other inmates. All ODOC inmates may only receive books, magazines, and newspapers from outside the institution directly from the publisher, also for security reasons.

Inmates in the IMU are issued small, 4", flexible black-ink pens. The pens are firm and flexible, but not rigid. Rigid pens create a serious security concern because they can be converted into a weapon that can be used against staff and other inmates.

IMU inmates have access to a state-issued toothbrush and baking soda. They can also purchase toothpaste and toothbrushes from the OSP canteen when authorized by their program level. IMU inmates cannot possess dental floss, because it can be and has been used to cause self-harm or as a weapon to harm others.

IMU inmates have limited access to the OSP canteen, dependent upon their program level. The IMU inmate handbook explains how

12 - OPINION AND ORDER -

inmates can make canteen purchases and what is authorized based upon program level.  All inmates are afforded basic necessities.

IMU inmates are permitted to have their personal property in their cell as authorized by their program levels.  As an inmate moves to a higher program level, he is authorized additional personal property.  The remainder of an IMU inmate's personal property not permitted in his cell is stored until the inmate's transfer from the IMU.

## **LEGAL STANDARDS**

Fed. R. Civ. P. 56(c) authorizes summary judgment if no genuine issue exists regarding any material fact and the moving party is entitled to judgment as a matter of law.  The moving party must show the absence of an issue of material fact.  Leisek v. Brightwood Corp., 278 F.3d 895, 898 (9th Cir. 2002).  In response to a properly supported motion for summary judgment, the nonmoving party must go beyond the pleadings and show there is a genuine issue of material fact for trial.  Id.

An issue of fact is genuine "'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" Villiarimo v. Aloha Island Air, Inc., 281 F.3d 1054, 1061 (9th Cir. 2002) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).  The court must draw all reasonable inferences in favor of the nonmoving party.  Id.

The substantive law governing a claim or a defense determines whether a fact is material. Addisu v. Fred Meyer, Inc., 198 F.3d 1130, 1134 (9th Cir. 2000).  If the resolution of a factual dispute would not affect the outcome of the claim, the court may grant summary judgment.  Arpin v. Santa Clara Valley Transp. Agency, 261 F.3d 912, 919 (9th Cir. 2001).

### DISCUSSION

## I.  Respondeat Superior Liability

To prevail on a claim under 42 U.S.C. § 1983, a plaintiff must show the deprivation of a right, privilege or immunity secured by the Constitution or federal law by a person acting under color of state law. L.W. v. Grubbs, 974 F.2d 119, 120 (9th Cir. 1992), cert. denied, 508 U.S. 951 (1993); Collins v. Womancare, 878 F.2d 1145, 1147 (9th Cir. 1989), cert. denied, 493 U.S. 1056 (1990).

"Liability under section 1983 arises only upon a showing of personal participation by the defendant" in the alleged constitutional deprivation. Taylor v. List, 880 F.2d 1040, 1045 (9th Cir. 1989); Arnold v. Int'l. Business Machines, Corp., 637 F.2d 1350, 1355 (9th Cir. 1981).  "'A supervisor may be liable if there exists either (1) his or her personal involvement in the constitutional deprivation, or (2) a sufficient causal connection between the supervisor's wrongful conduct and the constitutional

violation.'" Redman v. County of San Diego, 942 F.2d 1435, 1446 (9th Cir. 1991), cert. denied, 502 U.S. 1074 (1992) (quoting Thompkins v. Belt, 828 F.2d 298, 303-04 (5th Cir. 1987)); Larez v. City of Los Angeles, 946 F.2d 630, 646 (9th Cir. 1991); Taylor, 880 F.2d at 1045. However, it is well established that § 1983 does not impose liability upon state officials for the acts of their subordinates under a *respondeat superior* theory of liability." Monell v. New York City Dep't. of Social Services, 436 U.S. 658, 691-94 (1978); Taylor, 880 F.2d at 1045.

Plaintiff concedes he included Defendants Max Williams, Stan Czerniak, Brian Belleque, Brandon Kelly, Lonny Webb, and Craig Mitchell in this action because they are supervisors or managers of a state agency. Plaintiff fails to demonstrate that these Defendants participated in or directed the alleged violations of Plaintiff's rights, or that they knew of the violations and failed to act to prevent them. Accordingly, Defendants Czerniak, Belleque, Kelly, Webb, and Mitchell are entitled to judgment as a matter of law.

## II.  Qualified Immunity

The defense of "qualified immunity" protects "government officials . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have

known.  Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  This rule "'provides ample protection to all but the plainly incompetent or those who knowingly violate the law.'"  Burns v. Reed, 500 U.S. 478, 494-95 (1991) (quoting Malley v. Briggs, 475 U.S. 335, 341 (1986)).

The required first step in a qualified immunity analysis "is to consider the materials submitted in support of, and in opposition to, summary judgment, in order to decide whether a constitutional right would be violated if all facts are viewed in favor of the party opposing summary judgment."  Jeffers v. Gomez, 267 F.3d 895, 909 (9th Cir. 2001) (citing Saucier v. Katz, 533 U.S. 194, 201 (2001)).  "If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity."  Saucier, 533 U.S. at 201.

## A.  Due Process in IMU Classification

Plaintiff alleges Defendants denied his due process rights by classifying him to the IMU without a formal disciplinary hearing. To analyze Plaintiff's due process claim, the court must first decide whether Plaintiff was entitled to any process and, if so, whether he was denied any constitutionally-required safeguard.

Liberty interests which entitle an inmate to due process are "generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give

16 - OPINION AND ORDER -

rise to protection by the Due Process Clause of its own force, nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." Sandin v. Conner, 515 U.S. 472, 484 (1995) (internal citations omitted).

When deciding whether the Constitution itself protects an alleged liberty interest of a prisoner, the court should consider whether the practice in question "is within the normal limits or range of custody which the conviction has authorized the state to impose." Meachum v. Fano, 427 U.S. 215, 225 (1976). Only a hardship that is sufficiently significant will require due process protections. Ramirez v. Galaza, 334 F.3d 850, 860 (9th Cir. 2003), cert. denied, 541 U.S. 1063 (2004). Three guideposts to consider are: (1) the conditions of confinement; (2) the duration of the condition and the degree of restraint imposed; and (3) whether the sanction will affect the duration of the prisoner's sentence. Id. at 861; Keenan v. Hall, 83 F.3d 1083, 1088-89 (9th Cir. 1996). "Atypicality" requires not merely an empirical comparison, but turns on the importance of the right taken away from the prisoner. See Carlo v. City of Chino, 105 F.3d 498, 499 (9th Cir. 1997), cert. denied, 523 U.S. 1036 (1998).

Ordinarily, disciplinary classification transfers to other, more restrictive facilities or to other housing within a prison, do not raise liberty interests directly under the Due Process

Clause of the Fourteenth Amendment. <u>Sandin</u>, 515 U.S. at 486; <u>Meachum</u>, 427 U.S. at 224-25. As such, the ultimate inquiry is whether the confinement imposes atypical and significant hardship. <u>See</u>, <u>e.g.</u>, <u>Serrano v. Francis</u>, 345 F.3d 1071 (9th Cir. 2003) (holding that administrative segregation for disabled inmate in unit not equipped for a disabled person gave rise to a liberty interest), <u>cert. denied</u>, 543 U.S. 825 (2004); <u>Ramirez</u>, 334 F.3d at 861 (directing district court to consider the fact that inmate had been in segregation for two years in determining whether confinement constituted significant and atypical hardship); <u>Wilkinson v. Austin</u>, 545 U.S. 209 (2005) (holding that inmates' confinement in highly-restrictive "supermax" prison implicates a liberty interest).

Here, Defendants demonstrate that the conditions of Plaintiff's confinement in the IMU are remarkably similar to conditions in the Disciplinary Segregation Unit and the Administrative Segregation Unit. The conditions in the IMU are not atypical, and do not alone give rise to the level of "atypical confinement or significant hardship" sufficient to implicate due process concerns. In addition, Plaintiff presents no evidence that his inmate classification and placement in the IMU will affect the duration of his sentence.

While the IMU conditions generally are not atypical and the duration of Plaintiff's sentence is not affected, the length of

Plaintiff's confinement in the IMU does warrant attention. Plaintiff was confined in the IMU for over four years, from February 2002, to March 2006. Over the term of his confinement in the IMU, however, Plaintiff was provided continual opportunities to modify his behavior and program to a lower custody classification level. Plaintiff's lengthy confinement resulted directly from Plaintiff's failure to comply with programming requirements. As such, the court finds Plaintiff's placement in the IMU did not implicate due process considerations.

Even if Plaintiff's IMU placement implicated a liberty interest, however, Plaintiff received all process due under the circumstances. Nonpunitive placement in the IMU requires only an informal nonadversary review of the information supporting placement, including whatever statement Plaintiff wished to submit, within a reasonable time after confining him to the IMU. Hewitt v. Helms, 459 U.S. 460, 472 (1983); see also Toussaint v. McCarthy, 801 F.2d 1080, 1100 (9th Cir. 1986) (placement in segregation for administrative reasons requires only notice to prisoner, opportunity for prisoner to submit information, and nonadversary review of information supporting placement), cert. denied, 481 U.S. 1069 (1987).

Oregon inmates receive notice of all official classification actions, and may appeal any reclassification. Or. Admin. R. §§ 291-104-033, 291-104-035(1). Despite repeated classification

actions during his four-year confinement in the IMU, Plaintiff did not at any time avail himself of the appeal process. Indeed, Plaintiff's primary complaint is that he did not receive notice *prior* to his placement in the IMU. As such, Plaintiff received all process which might have been due under the Fourteenth Amendment. Defendants did not violate Plaintiff's constitutional rights and, as such, are entitled to judgment as a matter of law on Plaintiff's Due Process Clause claim.

   **B.    Eighth Amendment - Conditions of Confinement in the IMU**

   Plaintiff also alleges Defendants subjected him to cruel and unusual punishment in violation of the Eighth Amendment because the conditions of confinement in the IMU, namely the lack of privacy, constant lighting, inadequate ventilation, lack of access to personal property, strip-search policies, lack of access to telephones and visitors, and the use of tethers on handcuffs.

   The treatment a prisoner receives in prison and the conditions of his confinement are subject to scrutiny under the Eighth Amendment. Helling v. McKinney, 509 U.S. 25, 31 (1993). To be actionable under the Eighth Amendment, an alleged deprivation must satisfy both an objective component, i.e., the deprivation must be sufficiently serious, and a subjective component, i.e., the offending conduct was wanton. Farmer v.

Brennan, 511 U.S. 825, 833 (1970); LeMaire v. Maass, 12 F.3d 1444, 1451 (9th Cir. 1993).

The objective component of the Eighth Amendment requires prison officials to "provide humane conditions of confinement; prison officials must ensure that inmates receive adequate food, clothing, shelter and medical care, and must 'take reasonable measures to guarantee the safety of the inmates.'" Farmer, 511 U.S. at 834 (quoting Hudson v. Palmer, 468 U.S. 517, 526-27 (1984)). However, "only those deprivations denying the minimal civilized measure of life's necessities are sufficiently grave to form the basis of an Eighth Amendment violation." Hudson v. McMillian, 503 U.S. 1, 9 (1992) (internal quotations omitted).

In prison-conditions cases, the subjective component of the Eighth Amendment requires a showing that the prison official knew of and disregarded an excessive risk to inmate health or safety; the official must have been aware of facts from which the inference could be drawn that a substantial risk of serious harm existed, and he must have drawn the inference. Farmer, 511 U.S. 835.

While unpleasant, the IMU conditions complained of by Plaintiff were not so extreme as to rise to the level of an Eighth Amendment violation. Routine discomfort is part of the penalty criminal offenders pay for their offenses against society. Hudson, 503 U.S. at 9. Because Plaintiff was not deprived of the

21 - OPINION AND ORDER -

"minimal civilized measure of life's necessities" during his term of confinement in the IMU, Defendants did not violate Plaintiff's Eight Amendment right to be free from cruel and unusual punishment.   Accordingly, Defendants are entitled to judgment as a matter of law on this claim as well.

<u>**CONCLUSION**</u>

For these reasons, IT IS ORDERED that Defendants' Motion to Strike Plaintiff's Cross-Motion for Summary Judgment (#78) and Plaintiff's Cross-Motion for Summary Judgment (#70) are DENIED, Defendants' Motion for Summary Judgment (#43) is GRANTED, and this action is DISMISSED.

IT IS SO ORDERED.

DATED this  12th  day of June, 2007.


                        /s/ Donald C. Ashmanskas
                     Donald C. Ashmanskas
                     United States District Judge